[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Wayne Anthony Jacques, age 38, and the defendant, Joyce Marie Jacques, age 37, whose maiden name was Joyce Marie Satanski, were intermarried at Torrington, Connecticut on March 3, 1978. There are two minor children issue of the marriage, Sara Jacques, born May 22, 1994, and Olivia Jacques, born April 9, 1996.
The parties' 19-year marriage has broken down irretrievably, without hope of 1, due to a variety of intrafamily stresses which culminated in the plaintiff's moving out of the family home in late April of 1996, just two weeks after the birth of the parties' second child. Their relationship began to deteriorate after the birth of their first child and the death, six months later, of the defendant's mother. As the defendant sank deep into a depression brought on by her mother's death, the plaintiff, a problem drinker, began to stay out and away from home for longer and longer periods of time. The defendant's depression was compounded by her growing anger at her husband's neglect.
In 1995, soon after the defendant became pregnant with her second child, she was informed that the child might be suffering from spina bifida. Though it was later learned that the child was not so afflicted, the defendant's pregnancy, with this shadow hanging over it, was a worrisome, depressing time. Ultimately, Olivia was born prematurely, underweight and suffering from several serious ailments, including an allergy to milk. The plaintiff, who blamed defendant for Olivia's low birth weight and poor health, continued his pattern of staying out late and drinking, even after she was born. Two weeks after the defendant came home from the hospital, exhausted and suffering from major depression, the plaintiff moved out and served her with divorce papers.
Since the plaintiff left the family home, the defendant, despite her continuing depression and outpatient psychiatric treatment, has been the sole custodian of the parties' children. The parties agree that she should retain physical custody of the children after their dissolution is finalized, but that they should share joint legal custody of the children, with the CT Page 2329 defendant to have reasonable, liberal and flexible rights of visitation with them, to include Wednesdays from 6:00 p. m. to 8:00 p. m. and alternate Saturdays from 12 noon to 4:00 p. m.[1]
The defendant, however, has asked the Court to enter several orders concerning the process by which visitation is to occur, so as to avoid certain problems which have plagued the parties in the past. In particular, she asks this Court to order: that the plaintiff not consume alcohol either during visitation or within a set time prior thereto; that the plaintiff arrange to pick up and drop off the children, before and after visitation, with or in the presence of a mutually acceptable third party; and that the plaintiff be required to give 48 hours advance notice of his inability to keep any appointment for purposes of visitation The Court finds these requests to be reasonable, and will adopt them in view of the plaintiff's proven drinking problem, his proven unreliability in making support payments to his wife and childrenpendente lite, and his general thoughtlessness towards his wife both before and during their separation. The requested restrictions are not onerous, and they are clearly in the best interest of the children.
Looking to the future, the parties face potentially difficult economic times. The defendant wife and younger daughter have significant health problems requiring both general medical insurance coverage and, potentially, substantial additional expenditures for special care. However, the defendant's ability to earn an income is severely limited because of her need to raise and spend time with her children, her serious emotional difficulties, and her limited vocational skills. A high school graduate, she has previously worked part-time taking care of relatives' children and assisting with office chores in her husband's business. The only skills she claims to possess are culinary. Hence, her efforts to find part-time, third-shift employment have thus fair met with no success, and any position she obtains is likely to generate an income only marginally greater than what she can expect to pay out in child care expenses, at least for the next decade, while her children are small. As a practical matter then, any work outside the home is likely to add very little to her household finances for several years.
The plaintiff husband, by contrast, has significant work experience and vocational skills in the automotive field, where he can reasonably expect to continue working for the foreseeable CT Page 2330 future. Having previously worked,inter alia, for Goodyear Tire and Zeller Tire, where he changed tires, performed alignments, and otherwise serviced customers' vehicles, the plaintiff opened his own business, a sole proprietorship known as Wayne's Alignment Auto Service, in the late 1980's. Wayne's services and performs repairs on all types of motor vehicles, tows broken-down vehicles, both on private calls and on calls from the State Police, occasionally buys and sells used vehicles, and permits third parties to sell used vehicles off its lot after displaying them there for sale.
Wayne's owns substantial automotive repair equipment, including tools, a lift, and a flatbed truck which is used in its towing business. Though the business once owned a wrecker, which has since been sold, the wrecker was not the principal vehicle used for towing.
Wayne's is currently located at 74 Thomaston Road in Harwinton, a property bought by the plaintiff for $112,000 in or before 1993. The mortgage, which the plaintiff has kept current, now has a balance of about $90,000. Monthly payments on the mortgage are made in installments of $1,034.00.
In 1995, the plaintiff reported to the Internal Revenue Service that the gross income of Wayne's Alignment Auto Service was approximately $180,000. He claimed at trial, however, that in calendar year 1996 his gross receipts had dropped to approximately $100,000, giving him a weekly draw of $365.00. The plaintiff's explanation for this precipitous drop in income is that in 1996, the wrecker he allegedly used in his towing business was out of service.
The defendant, however, disputes the plaintiff's claim for two basic reasons. The first is that the plaintiff always did a considerable cash business, keeping two sets of books at all times — one for private customers, and the other for customers referred by the State Police. From the cash side of his business, claims the defendant, the plaintiff routinely drew an extra $50 to $100 per week.
The defendant's second reason for disputing the plaintiff's claim is that the plaintiff used the flatbed truck rather than the wrecker for his towing business. Thus, the unavailability of the wrecker could have had no impact on the towing business in 1996. This story was confirmed in major part by former Wayne's CT Page 2331 employee Patrick J. Garahan, who testified that the plaintiff did towing jobs using the flatbed truck in 1996, that he personally did some of those jobs, that customers frequently paid for the jobs in cash, and that the only jobs of which a written record was made were those referred by the State Police.
On the basis of the foregoing testimony, the Court concludes that the plaintiff has seriously underreported his income, both the gross income of Wayne's and his own weekly draw. The Court finds that the plaintiff draws an average of $75.00 per week from the unreported cash side of his business. The Court also finds that the business's gross yearly income is at least half again as high as the plaintiff claims it is, for his explanation of its sudden decrease is quite simply incredible. Assuming, then, that there is a simple proportional relation between the gross yearly receipts of the business and the plaintiff's personal draw, and accepting his statement that his reported weekly draw on actual gross yearly income of $100,000 would be $365, the plaintiff's actual draw from gross yearly income of $150,000 would be calculated as follows:
 $150 000 x ($365 Claimed Draw + $75 Cash Draw) = _________ $100, 000
1.5 x $440 = Actual Draw of $660 per week.
Notwithstanding his current and likely future income, however, the plaintiff, who is seriously considering filing for bankruptcy, has accumulated very substantial debt. The debt includes a second mortgage on the parties' residence in the approximate amount of $19,000, which was used primarily to finance the plaintiff's business, and several credit card bills, as well as doctor's bills for his wife and child Olivia during and after her birth. It also includes a lien of approximately $17,000 on a Cadillac automobile which he purchased during the pendency of this action.
Apart from the plaintiff's business, the parties' principal asset is the family home located at 173 Lincoln Avenue, Torrington, Connecticut. The home, which was purchased in 1984, now has a fair market value of approximately $65,000, but is encumbered both by a first mortgage in the approximate amount of $14,220 and the aforementioned second mortgage in the amount of $19,000. The parties lived together in the home until they CT Page 2332 physically separated after the birth of their second child in April of 1996. Since that time, the defendant wife and her daughters have lived in the home while the plaintiff husband has lived elsewhere.
The parties agree that the defendant and her daughters should continue to reside in the home, and thus that it should be transferred to her, though the plaintiff asks that he be awarded 25% of its fair market value, to be paid to him upon the death, remarriage or cohabitation of his wife or the eighteenth birthday of his younger daughter, whichever occurs last. Both parties agree that if the defendant retains the home, she should assume full responsibility for paying off the first mortgage on the property and should hold the plaintiff harmless and indemnify him with respect thereto. They disagree, however, as to the defendant's obligation to repay all or part of the second mortgage on the property, the plaintiff claiming the defendant should pay one-half, since part of the money went to improve the home, the defendant claiming she should pay nothing on that debt, since it was incurred principally to finance the plaintiff's business. The Court is persuaded that, although the true and overriding purpose of the second mortgage was to benefit the parties equally, since the home, at that time, was for both of them and the business was the sole source of their income, it is sensible and appropriate to assign full responsibility to repay the second mortgage to the husband if, as the parties agree, the family business should be transferred to him.
The defendant wife has also incurred substantial debt. As indicated on Schedule A of her financial affidavit and explained in her testimony, this debt totals approximately $5300 for credit card bills owed to Fleet Credit Card Service, Q Card, Filene's and First Card, $2250 in medical bills for herself and the children, and the aforementioned first and second mortgages on the family home. The other bills listed on her financial affidavit — from Sears, Mastercard and a Bank of Boston Line of Credit — are bills of the plaintiff, though they are listed in both parties' names.
The parties currently own three motor vehicles apart from those owned by the plaintiff's business as part of its resale inventory: the plaintiff's aforementioned 1994 Cadillac Deville, a 1989 Chevrolet Wagon currently driven by the defendant, and a 1984 Nissan 300 ZX automobile which, if restored, could have substantial resale value. The parties agree that the plaintiff CT Page 2333 should keep the Cadillac for his sole use and that the defendant should keep the Chevrolet for her sole use. They disagree, however, as to the disposition of the Nissan, the plaintiff asking that it be put up for sale, with the proceeds to be split evenly between the parties, and the defendant insisting that it be awarded exclusively to her.
The plaintiff currently has medical insurance through his business both for himself and for his two children. In the spring of 1997, however, in direct violation of this Court'spendente lite orders, he took his wife's name off the business's medical insurance, leaving her uninsured despite her vulnerable emotional and psychological situation. This unconscionable act, perpetrated contemporaneously with plaintiff's purchase for himself of his Cadillac, can surely not be justified on grounds of poverty, or on any other grounds for that matter. The gap in coverage thereby created must be closed at once and remain closed for the foreseeable future, at the plaintiff's sole expense.
At the close of all evidence at trial, the parties mutually requested this Court to grant them an immediate dissolution on the grounds of irretrievable breakdown, but to postpone the entry of all financial orders and orders regarding custody and visitation until the true status of the plaintiff's insurance coverage for the children could be ascertained and consultations could be had with the Family Relations Office concerning suitable arrangements for post-dissolution visitation. After the latter steps were taken, the parties both submitted written prayers for relief in this case.
The Court has fully reviewed the parties' prayers for relief in light of the evidence presented at trial and the well established legal principles that govern the awarding of child support, alimony, and the division of marital property.[2] On the basis of that review, it hereby enters the following orders:
1. The parties' marriage, as previously ordered, is dissolved on the ground of irretrievable breakdown.
2. The parties shall share joint legal custody of their minor children, with the children to reside primarily with the defendant wife, who shall have physical custody of them.
3. The plaintiff husband shall be afforded reasonable, CT Page 2334 flexible, and liberal visitation with the minor children, to include Wednesdays from 6:00 p. m. to 8:00 p. m. and alternate Saturdays from 12 noon to 4:00 p. m. However, his right of visitation with the children shall be exercised in the following manner: any exchange of the minor children for parenting time shall be between the defendant wife and a third party acceptable to both parties, or between the defendant wife and the plaintiff husband in the presence of a mutually acceptable third party; the plaintiff husband shall be responsible for transporting the minor children to and from any place where they are to be exchanged with the defendant wife before and after visitation; the plaintiff husband shall not consume alcohol during or within the eight-hour period next preceding any visit with the minor children; and if the plaintiff husband is unable to exercise his visitation rights on any date scheduled for that purpose, he shall give thirty-six (36) hours advance notice of his inability to have the visit to the defendant wife.
4. Neither party shall disparage the other or discuss adult issues in the presence of the minor children.
5. The plaintiff husband shall pay to the defendant wife the sum of $244.00 per week as child support for his two children in accordance with the child support guidelines promulgated pursuant to General Statutes § 46b-215a. Such child support shall continue for the period provided by law, and shall be reset, in accordance with the guidelines then existing, when the parties' first child no longer qualifies for support.
6. The plaintiff husband shall pay to the defendant wife $60 per week periodic alimony. Said alimony shall cease upon the death or remarriage of the defendant wife, or upon her cohabitation with another under the circumstances described in General Statutes § 46b-86 (b), whichever occurs first.
7. The plaintiff husband shall, from this day forward, for the time period provided in General Statutes § 38-262d, or for such longer period, if any, to which it may henceforth be extended by further statutory enactment, maintain medical insurance coverage for the benefit of the defendant wife which is comparable in all respects to that which he wilfully discontinued during the pendency of this action, in violation of this Court'spendente lite orders. In addition, he shall pay for all premiums, deductibles, prescription drugs, office visits and diagnosis, care, medication and other treatment for any pre-existing CT Page 2335 condition she may have for which comparable insurance to that which he discontinued is now unavailable for the defendant wife. Furthermore, the plaintiff husband shall be responsible for paying all unreimbursed health-related expenses for the defendant wife, including but not limited to expenses for psychological, psychiatric, optical, dental and similar care and treatment. The plaintiff husband must cooperate with the defendant wife in providing for conversion of all medical benefits into the defendant wife's name without lapse of benefits. Finally, the plaintiff husband's obligation to provide medical and dental insurance for the benefit of the defendant wife, and to pay all costs associated with any pre-existing condition for which he has rendered her uninsurable by discontinuing her coverage during the pendency of this action, is to be considered further alimony and spousal support.
8. The plaintiff husband must also be responsible for maintaining health insurance for the benefit of the minor children and to pay premiums therefor as additional child support. Any deductibles, payments for prescription drugs or unreimbursed care shall be borne fully by the plaintiff husband for the first four years following dissolution or until the younger child, Olivia, completes the first half of her first year in first grade, whichever is later. Thereafter, with the defendant wife presumably more capable of taking on the duties of a part-time daytime job, the parties shall share evenly all such costs of deductibles, prescription drugs and unreimbursed care.
9. The parties have divided their personal property to their mutual satisfaction. Each shall retain all right, title and interest to all personal property acquired pursuant to that agreement, free and clear of any claim of the other.
10. Pursuant to General Statute § 46b-81, the plaintiff husband shall transfer all his right, title and interest to the real property located at 173 Lincoln Avenue, Torrington, Connecticut, to the defendant wife, to be hers absolutely and forever. The defendant wife shall be responsible for paying the first mortgage on said property, and shall indemnify and hold harmless the plaintiff husband with respect thereto. The plaintiff husband shall be responsible for paying the second mortgage on said property, and shall indemnify and hold harmless the defendant wife with respect thereto.
11. The defendant wife shall waive any interest she may have CT Page 2336 in the equipment, vehicles, accounts receivable, and any other assets of the business known as Wayne's Alignment Auto Service, 74 Thomaston Road, Harwinton, Connecticut, and the same shall be the sole property of the plaintiff husband. Further the defendant wife shall quitclaim to the plaintiff husband any right, title and interest she may have in the real property on which said business is located, 74 Thomaston Road, Harwinton, Connecticut. The plaintiff husband shall indemnify and hold harmless the defendant wife as to any and all liabilities of Wayne's Alignment Auto Service, including but not limited to all mortgages, taxes, insurances, State and Federal taxes or penalties and interest due thereon, and any debts or liabilities of any kind arising from the ownership, use or possession of the property at 74 Thomaston Road.
12. The plaintiff husband shall maintain the present life insurance policy now in effect on his life in the amount of $100,000 for the benefit of his minor children, with said minor children listed as irrevocable beneficiaries and the defendant wife as Trustee.
13. In addition to all debts and liabilities of Wayne's Alignment Auto Service and the second mortgage on the family home at 173 Lincoln Avenue in Torrington, Connecticut, the plaintiff husband shall be responsible for all debts and liabilities listed on his own financial affidavit,and
all debts and liabilities listed on the defendant wife's financial affidavit except the first mortgage on the family residence and the credit card debts to Fleet Credit Card Service, Q Card, Filene's and First Card, which shall be the sole responsibility of the defendant wife. Each party shall indemnify and hold harmless the other for all debts and liabilities for which he or she is made responsible herein.
14. The plaintiff husband shall transfer all of his right, title and interest in and to the parties' 1989 Chevrolet Wagon to the defendant wife, and the defendant wife shall transfer all of her right, title and interest in and to the 1994 Cadillac DeVille to the plaintiff husband, who shall indemnify and hold harmless the defendant as to any expenses or liabilities associated with the purchase, ownership or operation of said vehicle.
15. The parties shall immediately put up for sale their 1984 Nissan 300 ZX automobile. Said vehicle shall be sold at fair market value, at a value to be agreed upon by the parties, or CT Page 2337 which may be assigned by an independent appraiser. All monies realized from the sale of said vehicle shall be divided equally between the parties, said sum to be used in partial payment of their respective attorney's fees, which each shall separately assume.
16. Each party shall retain sole and exclusive title to the savings and/or checking accounts as shown on their respective financial affidavits.
17. The parties have previously filed joint income tax returns. The plaintiff husband shall pay any deficiency due the State or Federal government for any taxes, penalties or interest due for any year in which the parties were married, and shall henceforth be entitled to claim both children as his dependents for tax purposes, provided he is current in making child support payments under the orders entered herein. If the plaintiff fails to make any child support payment due and owing under these orders, he shall forfeit his right to claim his younger child as a dependent for tax purposes during the year in which said payment was not made. If in any calendar year he fails to make four or more payments for child support due and owing under these orders, he shall forfeit his right to claim either child as a dependent for tax purposes during the year in which said payments were not made. In the event of any forfeiture provided for in this paragraph, the defendant wife shall be entitled to claim the benefit of the relevant exemption, so forfeited, for the relevant calendar year.
18. The Court declines to address herein any pending request that the plaintiff be held in contempt for failure to makependente lite alimony and child support payments to his wife, or that he be required to pay his wife's attorney's fees in connection with any such request. The Court's orders with respect to attorney's fees set forth in paragraph 15 above, do not apply to or account for any fees incurred in the prosecution of any motion for contempt. Such fees will be separately determined and assessed, as appropriate, at a later time.
Judgment may enter accordingly.
HON. MICHAEL R. SHELDON, J.